AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

ORIGINAL

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Safe Deposit Box 2105, U.S. Private Vaults, 9182 West Olympic Boulevard, Beverly Hills, California 90212

)
)
)
)
)
)

Case No.    15 - 2035M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, U.S.C., Sections 371, 1084, 1952, 1955, 1956 and 1957, conspiracy, illegal gambling, racketeering, and money laundering | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent John Burns
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10·26·2015

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Andrew J. Wistrich, U.S. Magistrate Judge
*Printed name and title*

AUSA: Stephen G. Wolfe

## ATTACHMENT A

### PREMISES TO BE SEARCHED

Premises known and described as Safe Deposit Box 2105, which is located and maintained at the store front vault business identified as U.S. Private Vaults, located at 9182 West Olympic Boulevard, Beverly Hills, California 90212-3540 (SUBJECT PREMISES 4). The store front is located in a strip mall on the south side of West Olympic Boulevard, west of South Oakhurst Dr., and east of South Palm Drive. The store has glass front windows with a lighted sign above the front door that reads "U.S. Private Vaults" in blue and red colors. The front door faces north toward West Olympic Boulevard and has the address "9182" displayed on the front door. SUBJECT PREMISES 4 is located inside the business and is constructed with a metal type of material, has a shiny metallic color, has a key lock on the front, and has the box number "2105" displayed on the front of the box.

## ATTACHMENT B

### I. Items to be seized

1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955; interstate and foreign travel or transportation in aid of racketeering enterprise, in violation of 18 U.S.C. § 1952; transmission of wagering information, in violation of 18 U.S.C. § 1084; money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and conspiracy in violation of 18 U.S.C. § 371:

a.      Any records, documents, programs, applications, or materials describing or constituting an illegal gambling business, including wagering paraphernalia consisting of sports information papers and line sheets; books of accounts; financial records (including but not limited to, bank statements, cancelled checks, ledgers, receipts, tax returns, real property documents, wire and other fund transfer records); monetary instruments; safe deposit documents and keys; safes, telephone books and address books; telephones and wireless telephones; checks; money orders; cash; financial records; notes; betting slips, tally sheets or controller sheets, ledgers or logs, and account books; settlement figures; summary sheets; betting slips; code names of clients; names and/or aliases of businesses used to conceal their illegal gambling business;

b.      Any digital device used to facilitate the above-listed violations and forensic copies thereof;

c.      With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

[Instrumentality Protocol]

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted between February 2014 and the present, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    i. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    ii. evidence of the attachment of other devices;

    iii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    iv. evidence of the times the device was used between February 2014 and the present;

    v. passwords, encryption keys, and other access devices that may be necessary to access the device;

    vi. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    vii. records of or information about Internet Protocol addresses used by the device;

    viii. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or

[Instrumentality Protocol]

"favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.      As used herein , the terms "records", "documents", "programs", "applications" and "materials" include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICES

4.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete

the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

       b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

       i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       c.      When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

       d.      If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.      If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.      If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.      If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

h.      The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

i.      Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.      Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Instrumentality Protocol]

## **AFFIDAVIT**

I, JOHN BURNS, being duly sworn, hereby swear and affirm the following:

## I. **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for ten years.  I am a graduate of the FBI Academy and, as such, am charged with the duty of investigating the violations of the laws of the United States, collecting evidence in which the United States is a party of interest, and performing other duties imposed by law.  My responsibilities include investigating offenses arising under Title 18 of the United States Code, including illegal gambling, money laundering, and related offenses.

2.      I am currently assigned to the New York Field Office of the FBI, specifically to a squad that investigates the Gambino and Luchese organized crime families of "La Cosa Nostra".  During my tenure with the FBI, I have participated in investigations of interstate and transnational organized crime and bookmaking enterprises, including offshore Internet bookmaking operations.  I have employed numerous investigative techniques, including physical surveillance, execution of arrest and search warrants, consensual recordings of individuals associated with organized crime, debriefing of cooperating witnesses and confidential informants, electronic surveillance via court-authorized Title III wire taps and preparation of search warrant affidavits. Thus, through my training, education and experience, I have become familiar with organized crime activities, including illegal activities involving racketeering, gambling, money laundering, loansharking and extortion, as well as the efforts of persons involved in such activity to avoid detection by law

[Instrumentality Protocol]

enforcement. I am familiar with and have participated in investigations conducted by the FBI into illegal bookmaking organizations.

3.      The facts set forth in this affidavit are based upon: (i) my personal involvement with the investigation; (ii) information received from other law enforcement officers involved in this investigation; (iii) my review of surveillance logs, wire intercept transcriptions, and other documents relating to this investigation; and (iv) my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of the collective knowledge of, or investigation into, the matters described herein. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. **PURPOSE OF AFFIDAVIT**

4.      I respectfully submit this affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of an Application for search warrants of the following:

(a)      The Premises located at 26421 River Rock Way, Santa Clarita, California 91350-3995;

(b)      The Premises located at 9524 Orizaba Avenue, Downey, California 90240-3227;

(c)      The Premises located at 4257 East Ocean Boulevard, Long Beach, California 90803-2996; and

(d)      The Premises known and described As Safe Deposit Box 2105, located at U.S. Private Vaults, 9182 West Olympic Boulevard, Beverly Hills, California 90212-3540 (collectively, the "SUBJECT PREMISES"), described further below and in Attachments A1

2                            [Instrumentality Protocol]

– A4 attached hereto and incorporated by reference herein, for evidence, instrumentalities and fruits, described further in Attachment B attached hereto and incorporated by reference herein, of gambling activity and money laundering in violation of Title 18, United States Code, Sections 371, 1084, 1952, 1955, 1956 and 1957.

5.    Based upon information set forth more fully below, there is probable cause to believe that evidence of violations of federal law including, but not limited to:  conducting an illegal gambling business, in violation of 18 U.S.C. § 1955; interstate and foreign travel or transportation in aid of racketeering enterprise, in violation of 18 U.S.C. § 1952; transmission of wagering information,  in violation of 18 U.S.C. § 1084; money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and conspiracy, in violation of 18 U.S.C. § 371; is located on the SUBJECT PREMISES.

## III. PREMISES TO BE SEARCHED

6.    I make this affidavit in support of an application for search warrants at the SUBJECT PREMISES, described more fully below:

SUBJECT PREMISES 1

(a) Premises known and described as the residence of Cyrus Irani ("Cyrus"), a single family two-story residence with a light brown stucco façade, located at 26421 River Rock Way, Santa Clarita, California 91350-3995 ("Subject Premises 1"). River Rock Way runs east and west. Subject Premises 1 is located on the north side of River Rock Way, with the front of the house facing south.  There is a two-car attached garage with a concrete driveway.  Subject Premises 1 sits atop a small canyon and there is a brick wall surrounding it.  The front bottom level of the residence is trimmed in a dark brown brick that extends approximately three feet

[Instrumentality Protocol]

up the facade.  The front (south side) of the residence has an overhang covering the gray cement porch.  The overhang separates the two levels of the residence and is made of dark brown wood covered in dark brown shingles.   There are three windows on the bottom level facing south and five on the upper level.  Three of the upper level windows sit above the two-car garage on the east side of the residence.  Two of the upper level windows are flanked by green wooden shutters.  The garage has an overhang covered by dark brown shingles.  The door of the garage is made of dark brown paneled wood with eight square windows lining the top.  The house number is located on the upper east corner of the residence east of the top corner of the garage above a porch light.  The west side of the residence has a light brown stucco facade with no trim.  It has at least eight visible windows, five on the upper level and three on the lower level.  The west side of the residence is secured by a light brown brick wall, approximately six feet in height.  The southwest corner wall is covered by shrubs.  The rooftop of the residence is covered by dark brown shingles.

## SUBJECT PREMISES 2

(b) Premises known and described as the residence of Clark William Bruner ("Bruner"), a single family one-story residence, along with the separate structure in the rear, both located at 9524 Orizaba Avenue, Downey, California 90240-3227 ("SUBJECT PREMISES 2").  Orizaba Avenue runs north-south; SUBJECT PREMISES 2 is located on the west side of the street, and the entrance is on the southern side of the residence. The façade appears to have beige aluminum siding. A brick driveway/walkway leads to the front door, and there appears to be a

4                                      [Instrumentality Protocol]

structure at the end of the driveway to the rear of the house on the south side. The street address, 9524, appears to be stenciled onto the concrete on the curb in front of the house. There is also a freezer outside in the rear of the house.

## SUBJECT PREMISES 3

(c) Premises known and described as the residence of David Chang ("Chang"), a condominium located at 4257 East Ocean Boulevard, Long Beach, California 90803-2996 ("SUBJECT PREMISES 3")(and collectively with SUBJECT PREMISES 1 and SUBJECT PREMISES 2, the "REAL PROPERTY PREMISES"). SUBJECT PREMISES 3 is a 2014 square foot, tri-level structure with two shared walls in a complex of approximately ten adjoining condominiums units. The facade appears to be made of white plaster and the two upper levels each have rounded balconies. It has a brown wooden front door that opens inward. It is the only visible access from the front. The rear of SUBJECT PREMISES 3 houses adjoining garages with wrought iron fences. The garages appear to be accessible from inside Subject premises 3, and are located directly underneath at ground level. The complex is located on the north side of the street, which runs from east to west. Starting from the unit at the eastern end of the complex, Subject Premises 3 is the fifth unit.

## SUBJECT PREMISES 4

(d) Premises known and described as Safe Deposit Box 2105, which is located and maintained at the store front vault business identified as U.S. Private Vaults, located at 9182 West Olympic Boulevard, Beverly Hills, California 90212-3540 ("SUBJECT PREMISES 4")(and, collectively with SUBJECT PREMISES 1,

5                                                    [Instrumentality Protocol]

SUBJECT PREMISES 2, and SUBJECT PREMISES 3, the "SUBJECT PREMISES"). The store front is located in a strip mall on the south side of West Olympic Boulevard, west of South Oakhurst Dr., and east of South Palm Drive. The store has glass front windows with a lighted sign above the front door that reads "U.S. Private Vaults" in blue and red colors. The front door faces north toward West Olympic Boulevard and has the address "9182" displayed on the front door. Safe deposit box #2105 is located inside the business and is constructed with a metal type of material, has a shiny metallic color, has a key lock on the front, and has the box number "2105" displayed on the front of the box.

## IV. STATEMENT OF PROBABLE CAUSE

A.   Background of the Investigation and of Gambling Organizations

7.     In or around February 2014, members of the NYPD began an investigation (the "Investigation") into the vast Cyrus Irani ("Cyrus") illegal sports gambling organization (the "Organization" or "Cyrus's Organization"). The Investigation now is being worked jointly by the NYPD, the Los Angeles Police Department ("LAPD"), the New York, Los Angeles and Las Vegas Field Offices of the FBI, the Queens County District Attorney's Office ("QDA"), and the Nevada Gaming Control Board ("NGCB"). The Investigation has involved, among other things, physical surveillance, court-approved electronic eavesdropping, the execution of search warrants on Internet-based gambling websites, and analysis of gambling and financial records. I have participated in the Investigation since approximately May 2014

[Instrumentality Protocol]

8.      Through the Investigation, I have learned that the Organization is located in California, New York, and elsewhere, including Arizona, Nevada, and Canada. I have learned further that generally, an illegal gambling organization has an ascertainable hierarchical structure, a continuity of existence, and a criminal purpose beyond the scope of the individual acts of accepting wagers. Illegal gambling enterprises are comprised of a group of persons sharing the common purpose of engaging in, and profiting from, the unlawful advancement of gambling. The Organization appears to combine conventional bookmaking and an unlawful Internet sports gambling network.

9.      From my participation in the Investigation, I have learned that members of the Organization include "bookmakers," "super agents," "agents," "money collectors," and "clerks," among others. The bookmaker sits at the top of the bookmaking enterprise directing its overall operation. Clerks are individuals located in a wire room; the head clerk is in charge of the wire room. Clerks ensure that the gambling activity or "figures" are reconciled for the bookmaker. A clerk may also function as "bookkeeper," dealing with issues regarding personnel and resources, and manage account information of the various bettors. Clerks also answer the telephone in the wire room and record bets called in by the agents and bettors. Many bookmaking operations, such as Cyrus's Organization, have moved away from having a local wire room by taking advantage of toll-free numbers and the Internet. In this scenario, the bookmaker operates his enterprise locally while the wire room is offshore where promoting gambling has been legalized. Bettors can log onto an Internet website or call toll-free numbers to place bets to the offshore wire room directly, and not through the agent. In this case, the agent can regulate the online gambling site without taking bets directly from the bettors.

7                              [Instrumentality Protocol]

10.     From my training and experience, I know that a bookmaking enterprise employs agents charged with building a clientele of bettors who will bet regularly with the enterprise, i.e., to get new players and more players. The agents act as intermediaries between the bettor and the enterprise itself; it is the agent's job to "settle-up" with the bettors, usually on a designated day each week, by collecting and paying out money owed. There are basically two ways an agent operates: he either places bets with the wire room for his bettors or the bettors call in the bets by identifying themselves and the agents by pre-arranged codes. The agent is generally compensated by taking a percentage of his customers' losses. Such enterprises may also have a "super-agent" who has agents under his control. The bookmaker oversees super-agents and agents.

11.     From my training and experience, I know that bookmaking enterprises also employ money collectors or runners, money distributors and "banks," to handle the flow of money between the participants of the enterprise. They are responsible for the collection and distribution of illegal gambling proceeds between the bookmaker and the agents. These money collectors/money distributors that act as banks are responsible for holding large amounts of money for the operation. Proceeds of the gambling operation are transferred in several ways, including through wire transfers and direct cash deposits via domestic bank accounts, checks drawn on personal and business banking accounts, and by hand-to hand exchanges of United States currency between members of the Organization.

12.     Based on my training and experience, and that of other law enforcement officers with substantial experience in gambling enterprises, I understand that people involved in illegal gambling typically keep evidence of this activity at their residences and business addresses in order to provide them with easy access to the items used to support and

8

[Instrumentality Protocol]

further their illegal activities. Additionally, as detailed below, individuals involved in a gambling enterprise typically keep records and other evidence of their illegal gambling activities for extended periods of time, beyond what is necessary for a single bet, because detailed records are needed in order to track each bettor's account on a weekly and cumulative basis. In part, this is true because individuals involved in substantial gambling enterprises, like the one set forth in this affidavit, have customers that are ongoing in nature.

13.     I have learned through the Investigation that many of the customers have a running tally of losses and wins; based on my training and experience, those who gamble have a tendency to do so for extended periods of time. Indeed, this fuels the ongoing nature of Cyrus's Organization, the gambling enterprise described in this affidavit. Consequently, this increases the length of time that gambling records, and other evidence of gambling, is maintained. These records are the ones bookmakers create, refer to, and maintain when they do their "numbers," a term discussed below in greater detail.

14.     Thus, I know from my training and experience that, as noted above and discussed further below, people involved in a gambling enterprise typically must keep records and other evidence of their illegal gambling activities for extended periods of time. In part, this is true because long-term bettors do not, as a matter of course, settle with their agents on a weekly basis. It is very common to have a "settle up" figure in place for individual accounts. A "settle up" figure is a number used as a threshold for determining whether the agent will collect money owed from, or pay money owed to, any given bettor. For example, if a bettor's settle up figure is $5,000, and on week one he wins $2,500, he will not receive his winnings. If, however, on week two, he wins an additional $3,000, his account has now crossed the $5,000 settle up threshold and his agent will pay him his

[Instrumentality Protocol]

winnings of $5500. Alternatively, if he owes $5,000 or more, his agent will come and collect the money from him. For this reason, detailed records are needed for extended periods of time in order to properly track each individual bettors account on both a weekly, and a cumulative, basis.

15.     Three of the locations I mention in this affidavit are the residences of individuals involved in substantial illegal gambling activities as part of the Organization. Because these individuals appear to conduct gambling activities over the telephone from their residences (the REAL PROPERTY PREMISES), I believe that evidence of the illegal gambling Organization will be found in the REAL PROPERTY PREMISES.  Additionally, based upon my training and experience, as well as my consultation with other law enforcement officers with substantial experience specifically in gambling enterprises, I understand that it is common for individuals involved in illegal gambling activities to use safe deposit boxes, such as SUBJECT PREMISES 4, to secrete their cash and other valuable proceeds of the gambling business.

16.     Deliberately omitted.

17.     Based on my participation in the Investigation, my training and experience, and discussions with other law enforcement officers, I know that persons involved in bookmaking often follow the same methods of operation, including the following:

a. When conducting bookmaking activity away from their residence or business, individuals involved in bookmaking will carry records depicting bettor codes; credit limits; bettor, agent, and runner telephone numbers; account figures; and other evidence of bookmaking on their person or in their vehicle, in written form in a notebook or folio, and/or in electronic form in a laptop computer, smart phone, or personal data assistant

10                                      [Instrumentality Protocol]

(PDA). When conducting their bookmaking activity at their residence or business, these same records can be found on or near the individual in their residence or business. However, persons involved in a bookmaking operation have been known to hide these records within their residence, business, and vehicles.

   b. Bookmakers often employ other persons to act as runners and agents in order to free the bookmaker from the day-to-day routine in order to concentrate on managing the enterprise. As the enterprise grows, it becomes increasingly necessary for the bookmaker to rely on other persons in order to expand the number of individuals placing bets.

   c. Individuals involved in bookmaking commonly use computer systems and networks to conduct or facilitate the activity. These computer systems and networks are used to give and receive point spreads and odds; to make and accept wagers via the Internet; to store and record bettor lists, ledgers, records, and co-conspirator lists; and to check agent and bettor account figures with the wire room via the Internet. Cyrus's various web sites, and other internet-based sports gambling, operate with limited access to their websites and therefore utilize special account numbers and passwords. With these account numbers and passwords, bookmaking agents can access the sports gambling website and check the status of a bettor's account via the internet.

B.  <u>Structure of Cyrus's Organization</u>

  18.  Based upon my participation in the Investigation, including intercepted phone calls, and interviews, and discussions with other participants in the Investigation, I am aware of the structure of Cyrus's Organization, which I have described in the next several paragraphs. In this Investigation, Eavesdropping Warrant #061301 was signed by the Honorable Robert J. McDonald, Justice of the New York State Supreme Court, Queens

11

[Instrumentality Protocol]

County, on February 13, 2014.  This warrant, and subsequent extensions and amendments thereto, authorized the interception and recording of gambling-related conversations over various cellular telephones, which warrant is still being executed. As a result, eavesdropping has led the investigative team to numerous participants in this illegal gambling organization located in New York, Nevada, California, and elsewhere.  Cyrus, among others, was included as a target subject.

19.     Cyrus is the bookmaker and the head of the Organization, with well over 1500 accounts under his ultimate supervision.   Traditionally, at least a percentage of the bookmaker's money is invested in the gambling enterprise. All decisions go through him.  If an agent wants to add new accounts, change a customer's gambling limit, or change the percentage that the agent receives on his gambling customers, he must receive Cyrus's approval. Cyrus also ultimately receives the money from the Organization.  Cyrus also owns about seven various websites, including www.365ActionSports.com, www.betclarksway.com, www.Wager888.com, www.bet23red.com, and www.moneyballsports.com, and decides if players should be kept or shut down.

20.     Cyrus operates in California, but has several agents who live and conduct illegal gambling business in the Eastern District of New York and elsewhere.  The bookmaker meets and/or talks with the super agents on a regular basis, either to receive money for the bettors' losses or to pay out money for the bettors' winnings, i.e., "settling up." Agents have authority to make some managerial decisions and to extract a share of the sub-agent's income from illegal sports wagering.

21.     Bruner, a super-agent, is one of Cyrus's biggest agents, managing well over 200 agents and sub-agents. As such, Bruner maintains accounts and collects money from

12                      [Instrumentality Protocol]

those agents. The agents are partners in the gambling enterprise with the bookmaker, and they share in the profits of their players' losses for the week, usually in increments of 50 %, 25% or 10%. The agent's account is also based upon weekly wagers, except in the agent's case the figure is tallied by the total bets of all the agent's bettors in a given week. If the total settle-up figure for a week reflects losses by the agent's players, the agent will collect such losses from the bettors and will share with the bookmaker the profits according to whether the agent has a half sheet (50% increment) or a quarter sheet (25% increment). In the event that the agent's bettors have a winning week, the bookmaker will supply the agent with all of the bettors' winnings.

22.     The agent recruits new bettors and should know the financial capability of each bettor to pay his losses. The agent can set limits on the bettors' weekly wagers by calling a clerk and setting a limit on the bettor. If the bettor does not pay the agent, it is ultimately the responsibility of that agent to collect such money. The bookmaker will supply the agent with the resources, usually personnel, to collect losses either by strong persuasion in the form of threats or by physically harming the bettors. If the agent is unable to locate the bettor, the agent must pay the bookmaker for the bettor's losses. Chang is a money collector, collecting and delivering money on behalf of Cyrus and Bruner.

23.     Based on the state wiretaps, I have learned further that the Organization employs a wire room through which bets are taken over the phone or via the Internet by clerks; it serves as a clearing house for collecting, dispensing, and accounting for money won and lost on sports bets and a place where records of gambling accounts for bookmakers and their agents are housed. As discussed above, the head clerk supervises clerks and deals directly with the bookmaker; clerks answer telephone calls at the wire room and record bets

13

[Instrumentality Protocol]

called in by bettors. An accountant maintains the financial records of the operation. Together, the head clerk and accountant assist the bookmaker in ensuring that the gambling activity or "figures," are reconciled.

C.    SUBJECT PREMISES 1

24.    Investigation has revealed that Cyrus resides at SUBJECT PREMISES 1. The Last Deed of Record is a Corporation Grant Deed, dated July 5, 2012, and recorded August 30, 2012. In that deed, Lennar Homes of California, Inc. transferred title to "Cyrus A. Irani, Trustee of the Cyrus A. Irani Living Trust." Surveillance has also placed Cyrus at SUBJECT PREMISES 1at various times during the investigation. For example, on February 12, 2015, agents; observed Cyrus leave SUBJECT PREMISES 1 and go to U.S. Private Vaults, the location of SUBJECT PREMISES 4. Cyrus was also observed leaving SUBJECT PREMISES 1 on September 18, 2015. In addition, subpoenas were served on J.P. Morgan Chase Bank, Wells Fargo Bank, Bank of America, and Federal express for any and all bank accounts controlled or jointly held by Cyrus A. Irani. All the banks reflect the address as SUBJECT PREMISES 1. The account statements for three J.P. Morgan Chase accounts: (i) The Cyrus A. Irani Living Trust; (ii) The Melineh Kikeshan Irani Living Trust; and (iii) the joint account of Melineh Kikeshan Irani and Cyrus A. Irani, are mailed to SUBJECT PREMISES 1. Wells Fargo savings account statements for an account in the name of Cyrus A. Irani are mailed to SUBJECT PREMISES 1. Bank of America saving account statements for an account in the name Cyrus A. Irani Living Trust are mailed to SUBJECT PREMISES 1. Finally, a Federal Express shipment information report shows that Cyrus A. Irani is a regular recipient for packages delivered to SUBJECT PREMISES 1.

[Instrumentality Protocol]

25.     Pursuant to duly issued and valid warrants, the NYPD has intercepted the telephone calls Cyrus made over two cell phones from February 24, 2014 to May 6, 2015 and from April 30, 2015 to October 19, 2015. The NYPD has intercepted the following phone calls: (a) 4,100 pertinent telephone conversations, respectively between Cyrus and members of Cyrus's Organization that contain clear evidence of an illegal sports gambling enterprise, (b) a total of 214 pertinent calls between Cyrus and Bruner containing clear evidence of an illegal gambling enterprise; (b) a total 34 pertinent telephone conversations between Cyrus and Chang containing clear evidence of an illegal gambling enterprise.  In addition, from February 6, 2015 to October 19, 2015;  (c) 1,116 pertinent telephone conversations between Bruner and members of Cyrus's Organization that contain clear evidence of an illegal gambling enterprise, (d) 17 pertinent calls between Bruner and Chang containing clear evidence of an illegal gambling enterprise.   Based on the intercepted phone calls it is clear that Cyrus is the bookmaker and the head of the Organization, Bruner is a super-agent and Chang is a money collector involved in the Enterprise.  My conclusions about the evidentiary significance of the intercepted calls are exemplified in the specific intercepted calls set out below.

26.     A recorded conversation between Cyrus and one of his agents named Bob LNU, (call # 5272) made on May 26, 2014, demonstrates that the Organization is very large. In that conversation, Cyrus told Bob that Cyrus is "a big bookmaker . . . probably the biggest and, well definitely the biggest in California." As such, Cyrus says "everyone knows me, so I can't get these accounts on my own." I understand that statement to mean that he needs more and more agents to continue building the enterprise to include even more bettors.  In

[Instrumentality Protocol]

order to get accounts, he has to find guys, i.e., agents, as described above, to get the accounts for him. It works for Cyrus because Cyrus gives "them a piece of the account."

27.     That conversation further illustrates that Cyrus manages the Organization from his home, SUBJECT PREMISES 1. During the call, Cyrus gave five accounts to Bob, but first had to go to his office (I believe from the context of the call it was his home office) to get the information, because that was where he kept the information, "written on a piece of paper." Then, Cyrus provided the name of the website, then the account name, then the password to all five accounts. Cyrus then assured Bob that "all these five accounts are just yours no one else has access to them." That call corroborates that (a) Cyrus runs the Organization; (b) he manages the gambling enterprise from his home; and (c) he uses his computer to conduct the business.

28.     During that conversation, Cyrus also asked Bob whether he wanted to "settle after a certain figure? Like ten dimes five dimes . . .?" Bob stated that "ten is fine." By my training and experience, I know that a "dime" equals one thousand dollars. Hence, ten dimes equal ten thousand dollars, and five dimes equal five thousand dollars. This part of the conversation illustrates the settle-up discussion, discussed above in paragraph 14, in that Bob would settle up with Cyrus after the debts reached a predetermined amount.

29.     Cyrus keeps cash at SUBJECT PREMISES 1 to pay out to the agents. (call 7367, made on October 5, 2015 and call 6659, made on September 28, 2015), discussed in greater detail below). Cyrus also keeps his gambling proceeds in other forms at SUBJECT PREMISES 1. Specifically, on May 27, 2014, (call 5331) Cyrus advised one of his agents, stating that he "should set up a corporation [where] all the money that goes in . . . is revenue and all the money that goes out is [an] expense." This shows that records from the

16                          [Instrumentality Protocol]

corporation will be relevant evidence showing the proceeds of the gambling operation and of money laundering offenses. Cyrus also keeps illegal gambling proceeds invested in comic books and watches. During that same May 27 conversation, Cyrus advised that he is a watch collector. He stated that:

> I have a couple like sixty seventy thousand dollars watches umm and I recently, I'll buy one every month like last month I bought this omega and I put twelve thousand and what I do is I give him nine nine hundred in cash even if you go to a store bro I'm talking about anything even a a story . . . like anything over ten thousand in cash they fill out one of those forms . . . so like I give him ninety nine hundred in cash and I put the final like two thousand on my credit card. . . .

30.    Numerous calls demonstrate that Cyrus also maintains substantial illegal gambling proceeds in collectable comic books. On July 3, 2014 (call 7521), Cyrus had a call with an agent named Mike who has a connection to a private comic book collector. Mike suggested that Cyrus give him "fifty grand and let me" purchase comic books from his sources. Cyrus told him that he had "a lot of cash I need to get rid of," so Cyrus could give him cash for comic books. Mike advised that some collectors are not comfortable dealing with large sums of cash. He had sent "payment already for the Incredible Hulk One eighty One the first wolverine so he met me he's going to try to mail it out the following day and get [the] tracking number." Cyrus also said that he was having a cabinet built to display his comic books, at which time he said he had approximately twenty (call 16792).

31.    Another call, dated September 10, 2014 (Call 10936) showed that Cyrus regularly maintains proceeds in comic books, art work and watches. Cyrus spoke with an individual who had been arrested and was then on either probation or pretrial release and asked whether law enforcement took any of his property. Cyrus then stated:

17                    [Instrumentality Protocol]

> that's why lately I've been on this spending spree. You wouldn't believe the shit I've, you wouldn't believe the shit I've bought in the last like, like, six months. I've bought artwork, comic books. I've spent eighty-three thousand on a comic book. Like the first ever issue of Thor. . . . I bought like all these Rolex watches. I'm just buying shite cause I just, in my mind I feel like I'm safer.

32.    Cyrus also keeps cash at SUBJECT PREMISES 1 for use in the illegal gambling operation.  Cyrus keeps the cash in a safe in his home, SUBJECT PREMISES 1. Specifically, during a call on November 21, 2014 (call 15668), Cyrus advised that

> Andy is on his way over to my house right now to pick up and so I'm just looking through my safe, I have a ton, I have all hundreds, but I don't have any twenties or loose change. Can I give Andy twenty even or even twenty-one even, then just do a Chase Quick Pay for the change?

That call shows that Cyrus maintains cash in a safe at his home for use in conducting the Organization's gambling business.  According to Cyrus, the gambling business is very lucrative; he makes "a couple . . . . million . . . dollars a year." (call 15002 dated November 11, 2014).

33.    Cyrus also maintains a machine so that gamblers could pay their gambling debts with a credit card. On February 7, 2015 (call 55), Cyrus told Bruner that a "Chris" gave Cyrus a credit card number, and Cyrus "ran it through [his] machine . . . for a hundred fifty bucks."  As the credit card company takes four percent off the top, Cyrus noted that only $144 went into his account.  Cyrus continued, "this credit card thing is good so you know if you ever have anyone ah you know I could definitely do that for you. . . . I have my own fucking machine it comes up it pops up Cyman Entertainment on your statement."

34.    Cyman Entertainment is Cyrus's company through which he runs his gambling earnings.  As he explained to one of his agents, he maintains the business as an "S" corporation, though he used to have an LLC. Still, he assured that agent, "I don't think

18                                    [Instrumentality Protocol]

you're in a position where you make as much money on this whole thing where you need to pay taxes on it. I mean you're probably not on anyone's radar." [call 5331 between Cyrus and "Eric," May 27, 2014].

35.   Additional evidence of Cyrus's control over the Organization and his use of computers in conducting its business is contained in a May 4, 2015 phone call with an agent named Joey LNU (call 193). In that conversation, Joey called to complain about his inability to log onto the gambling website. Cyrus told him

> Cyrus:  Oh yeah, yeah, yeah. My bad. I changed . . . I forgot to mention, I changed your password on the agents' page. The password is now Joey ninety-nine. Joey ninety . . . What was it It's eighty-eight hundred CY Joey ninety-nine. I meant to send you a message. But that's my fault.
> Joey:  O.k.
> Cyrus:  That's my fault. So eight-eight hundred and Joey ninety-nine.
> Joey: Ok, Ok.
> Cyrus: But as far as your account goes, bro I don't see any problem with it man, and I have two thousand customers so I know my phone would be ringing off the hook. Every time there is a problem, I get twenty-five phone calls every ten seconds. So, I mean, no one else has called me so I don't think there is any problem with the website.
> . . .
> Cyrus: By the way, you don't have, I meant to tell you, you don't have to use one absolute. I own like seven sites and you can use any of the seven sites and they will work. You know I have wager eight eight eight. I got money ball sports dot com. . . . Yeah, I have a bunch of sites.
> . . .
> Cyrus:  I changed your password because I have a feeling that somebody, I don't know if it's Matt or, I know someone has access to your agents page and probably not actually I'm probably just taking the safety precaution. But I did change the password to your agent page. Then also I gave you full access so now you should be able to change your limits around like however so fit. You know change the limits and change the passwords around and all that.

That call again demonstrates that Cyrus controls web access to the gambling sites, and uses his computer in conducting the Organization's business.

19                    [Instrumentality Protocol]

36.     Further to Cyrus's leadership role in the Organization, in June 2015, Cyrus

hosted a meeting of his agents at a conference room at Caesar's Palace in Las Vegas,

Nevada. For the past six or seven years, Cyrus had hosted an annual party in Las Vegas.

(Call 918 dated May 21, 2015 between Cyrus and Keith, a wire room clerk).  In a call on

May 21, 2015, intercepted and monitored pursuant to the order of April 30, 2015 by the

Honorable Robert J. McDonald, Justice of the Supreme Court of the State of New York,

Queens County, Cyrus spoke with Kyle LNU, apparently a head clerk in the wire room,

about the meeting (Call 919).  In order to reach Kyle, Cyrus first had to provide his agent

identification and his password for security.  In that conversation, Cyrus provided a

comprehensive description of the entire weekend of the meeting, as follows:

> [E]very year I throw . . . this big party in Vegas. I've done it like, I don't know,
> six or seven years. . . . I invite all my agents out umm and I get these two big,
> these two big cabanas, at the beach day club in Vegas, and we all have a great
> time (inaudible) literally this is a lot of fun umm ... It usually costs me like,
> thirty, forty thousand but, you know, what it's like (stuttering) my way of
> giving back to the agents. . .

> But this year, I'm doing something . . . slightly different. I'm doing the usual
> party on Saturday, June 27th in Vegas but, the night before, I'm doing . . . an
> actual formal corporate meeting. I . . . have . . . a boardroom set up at the
> Ceasar's Palace, . . . where I'm hosting food and, it's . . . really an . . . open
> forum for the agents to ask questions, for me to talk to them about stuff, . . .
> regarding security, . . . being careful about who they . . . deal with, or who they
> talk to; making sure everyone has my lawyer's phone number, and then, also
> about other stuff regarding the web site regarding live wagering, regarding
> how to get new players, and how to add on new players. I mean, it's gonna be
> a complete[ly] open forum where, . . . probably about fifty agents will be
> there so . . . they, can ask questions and talk about whatever they want to talk
> about . . . ...

37.     Cyrus not only called, scheduled, and set the agenda for the meeting, but he

also determined who could and could not attend.  A June 2, 2015 telephone conversation

[Instrumentality Protocol]

(call 1293) Cyrus had another conversation with an agent named Jeffery Metelitz illustrates this point, as follows:

| | |
|---|---|
| CYRUS: | You know, the agents can voice their concerns. Ask questions. |
| METELITZ: | How many, how many agents are you anticipating? |
| CYRUS: | I'm thinking about between forty and fifty. |
| METELITZ: | So it's gonna be a big crowd. |
| CYRUS: | Definitely, definitely, definitely. |
| METELITZ: | Yeah, can an agent bring like a sub agent? or stuff like that? |
| CYRUS: | Yes, sub-agents definitely. Sub-agents definitely because one of the biggest topics we talking about is how to get new players and get more players. |
| METELITZ: | Ok. |
| CYRUS: | It's important that sub-agents know, you know it's important that sub-agents are there so they know how to get new players and get more players. |

Hence, during that conversation excerpt, Cyrus made it clear that agents and sub-agents were welcome.

38.    Another excerpt from that conversation, however, made it clear that Cyrus was not welcoming aspiring agents. When Metelitz asked about bringing someone interested in becoming an agent, Cyrus said no: "if he's interested he can have a private meeting with me." Metelitz explained why he wanted to invite a prospective agent to the meeting, stating "I thought maybe it [would] be interesting for him to at least, you know, maybe sit for five or ten minutes just to see what it was kind of about." Cyrus said that the aspiring agent could refer bettors to the Organization, but "just because someone wants to become an agent doesn't mean they're actually gonna become an agent." Metelitz responded

Well of course not. But I figured, you know what? I mean, but if it's somebody we all know and trust. I mean, you know (stutter), I wouldn't bring a stranger in. I mean, you know, cause the last thing you need is somebody undercover.

Cyrus said that this is just a meeting, that he would also have his lawyer there, but did not want non-agents present. He said:

21                    [Instrumentality Protocol]

My lawyer is gonna talk to people about, you know, being secure and, you know, security issues and stuff like that. You know, until you're an agent, (stuttering), I'm just going to be for agents only so...

METELITZ relented, and agreed not to invite the aspiring agent.

39.     On June 26, 2015, pursuant to an eavesdropping warrant signed by a federal judge for the District of Nevada, members of the NYPD, FBI, and NGCB, observed and heard Cyrus's agents-only meeting at Caesars Palace Hotel and Casino in Las Vegas referenced above. I have heard and watched the recording. Over forty agents attended – including Clark W. Bruner, and money collector David Chang. Cyrus was clearly in control; after several minutes of socializing and eating, Cyrus called the meeting to order. The video shows that Cyrus first lectured his agents on what to do in the event of an arrest, reminding them to say nothing.

40.     Next, Cyrus' lawyer, James D. Henderson, Esq., gave a talk on how to avoid law enforcement. I have been informed that because Mr. Henderson is Cyrus's attorney and not the attorney for all persons at the meeting, the government believes that this conversation is not protected by the attorney-client privilege. Explaining that he was a former federal prosecutor, assigned to prosecute RICO violations and organized crime, Mr. Henderson gave advice on using "burner phones" to prevent being a subject of a Title III wiretap, how to avoid becoming targets by writing off gambling debts instead of employing violence, and how to avoid money seizures by keeping money stored in various locations. He said, "Too much money in one places makes the case look a lot bigger . . . I don't know how much [bookmaking] money you guys have stored around, but it's something to think about. Diversification is probably – like being in the stock market – the best way to . . . do your business." Finally, Cyrus had a question-and-answer session where agents asked the lawyer

[Instrumentality Protocol]

questions and gave each other advice on what techniques for avoiding law enforcement worked for them. The meeting lasted for about ninety minutes.

41.     Other intercepted calls further show that Cyrus conducts the Organization from his home, and that he keeps and has access to gambling records and proceeds from gambling in his house. For example, in recent recorded conversations, made on September 28, 2015 (calls 6668 and 6659), Cyrus stated that "Monday and Tuesday are when I do all my numbers . . . I'm literally working twelve hours at home just doing all my numbers." I take that to mean he is reconciling the amounts owed to the Organization as well as the amounts it owes, as discussed above in paragraph 14. These statements show that Cyrus keeps gambling records, i.e. "the numbers," in his home.

42.     This call also shows that Cyrus continues to maintain some of the proceeds in comic books. For example, in that same call discussed above made on September 28, 2015 (calls 6668 and 6659), one of the agents wanted to meet with Cyrus to pick up money. Cyrus replied that the agent could "come by my house and what I'll do is I'll run outside . . ." Cyrus explained further that "on Monday and Tuesday I work out of home but I work I literally work all day and all night. . . . [T]hat's why I told Jim ah you know if you want to come by here Monday or Tuesday, I'll be happy to run outside and pay you. . . . Just give me maybe fifteen minutes notice so I can prepare the package." I believe the "package" refers to the cash that is to be paid for gambling debts.

43.     In that same call referenced above, it was discussed that an agent's wife was coming to Cyrus's house to pick up money. Cyrus said that he would just meet her outside to give the money to her, but the agent joked that "you're not going to show her your collection? . . . She's dying to see your comic book collection." Cyrus responded that he

23

[Instrumentality Protocol]

now owned four copies of the Incredible Hulk No. 1. Cyrus noted that it had already gone up in value twenty percent, that it is the hottest comic book on the market, and teased that perhaps he could pay the agent with a comic book instead of money.

44.     Other intercepted calls further demonstrate that Cyrus maintains gambling records and proceeds in his home, SUBJECT PREMISES 1. On October 5, 2015, in another recorded call, Cyrus advised an agent that "Mondays and Tuesdays I don't pay anybody unless they come to my house or meet me by my house." He continued that he could pay the guys on Wednesday, and if an agent wanted to be "paid sooner, [he could] always drive out to my house on a Monday or Tuesday and I'll have the money for you."

45.     Based on my training and experience, as well as the evidence provided above, I believe that Cyrus must keep and maintain extensive records in order to manage the Organization. Consequently, there is probable cause to believe that he keeps documents, records, proceeds and items relating to the Organization at his residence, SUBJECT PREMISES 1, which represent evidence of the charges set forth in this affidavit.

D.    SUBJECT PREMISES 2

46.     The investigation has revealed that Bruner resides at SUBJECT PREMISES 2. LAPD analyzed the trash from that location, and found multiple pieces of mail addressed to Bruner at The Orizaba House. Property records show that Bruner owns SUBJECT PREMISES 2, along with a "Sandra D. Bruner. Motor vehicle records show that a 2014 Chevrolet Silverado is registered to Bruner at SUBJECT PREMISES 2. LAPD officers have observed such a vehicle parked in front of SUBJECT PREMISES 2, and have observed Bruner driving it. In addition, Bruner's driver's license shows SUBJECT PREMISES 2 as his address. Surveillance has also placed him at SUBJECT PREMISES 2 on numerous

24                    [Instrumentality Protocol]

occasions. As referenced below, Bruner has on numerous occasions instructed others within the Organization to deliver cash to him, or to pick up cash from him, via a freezer located in the rear of SUBJECT PREMISES 2. Based on the all above, I believe that Bruner resides at SUBJECT PREMISES 2.

47.     As noted earlier in paragraph 25, NYPD intercepted a total of (a) 214 pertinent calls between Cyrus and Bruner containing clear evidence of an illegal gambling enterprise; (b) 1,116 pertinent telephone conversations between Bruner and members of Cyrus's Organization that contain clear evidence of an illegal gambling enterprise; and (c) 17 pertinent calls between Bruner and Chang containing clear evidence of an illegal gambling enterprise. My conclusions about the evidentiary significance of the intercepted calls are exemplified in the specific intercepted calls set out below.

48.     The Investigation has revealed that that Bruner is a super-agent, with many agents under his authority in the Organization. In an intercepted call on August 23, 2014 (Call 9587), Cyrus advised one of his agents that Clark {Bruner] is one of Cyrus's "biggest agents. He's got almost 200 players with me . . ." During that conversation, Cyrus also reiterated that Cyrus is probably the biggest [bookmaker] "in the United States, then I know for sure in California . . .," and that Cyrus has agents "all over the place." In securing the location for the June 2015 meeting in Las Vegas, Bruner signed the contract and provided as his title, "Partner/Co-President" of Cyrus's company, Cyman Entertainment, Inc. Bruner also attended the Las Vegas meeting in June 2015.

49.     Based on my training and experience, as well as on the intercepts calls, texts, and other information in this case, I believe that Bruner keeps and maintains records in order to fulfill his duties. For example, when a person places a bet, records must exist showing the

25                                    [Instrumentality Protocol]

amount of the bet, the event, such as a sporting event, upon which the wager was placed, the person who placed the bet, whether the money was paid, and whether paid in full or installments. Indeed, it would not be possible to handle the large volume of wagering without written or electronic records of this activity.

50.     Moreover, the records must be maintained at least long enough to reconcile the account of the gamblers. In my experience investigating gambling operations, records, including documents and voice recordings for bets made over toll free phone numbers, and/or the Internet, are kept for an extended period of time after the particular event on which the wager was placed so that there can be no disputes later. In addition, in my experience investigating gambling operations, regular, ongoing gambling businesses such as this must have cash available to pay bets and often receive cash from the customers/gamblers. Consequently, it is reasonable to believe that Bruner keeps documents, records, proceeds and items relating to the Organization's illegal activities in SUBJECT PREMISES 2.

51.     During a call on April 7, 2015 (Call 4864), a gambler named Dave called Bruner and advised that he was nearby and "was gonna stop by and get you paid up." Bruner was not home, so Dave asked if Bruner wanted him "to throw it in the freezer? This is a lot of money, though." Bruner hesitated a bit and asked whether the package would fit in the mailbox. Even though Bruner would rather the money go into the mailbox, he decided against having Dave put the money in the mailbox because the maid was there. I believe that Bruner decided not to risk putting money in the mailbox while the maid was there. Bruner advised him to "Just put it in the freezer. Put it behind something." Dave asked Bruner to be sure to let him know when Bruner actually received the package as it was a lot of cash. I

26

[Instrumentality Protocol]

note that Bruner was more comfortable putting a large amount of cash in the freezer in the rear of his house than with risking the maid seeing the large package go into the mailbox. These calls all show that cash was regularly transferred via the freezer, and that there must be cash and numerous records inside SUBJECT PREMISES 2.

52.     On July 8, 2015 (Call 12786), Bruner had a telephone conversation with Chang about money that Chang was delivering to Bruner.  Chang said hello, and before Bruner returned the greeting he immediately requested Chang to "just, just put it in the freezer. I'm at my realtor." Bruner was unable to get to SUBJECT PREMISES 2 immediately, so just assured Chang that he could "just put it in the freezer. Please." Chang agreed to do so, but also asked if Bruner would "make sure you text me or call me, let me know you got it?" Bruner assured him that he would, and that it would be within an hour.

53.     Numerous calls have demonstrated that Bruner receives cash at his home, specifically, in the freezer located outside in the rear of the house.  On July 23, 2015, for example, "Chris" asked Bruner whether he "put some money in the freezer." (Call  14072). Chris is one of Bruner's sons and an agent in the Organization.  Bruner asked whether Rich was there. I believe Bruner was referring to Richard Vanderwyk, a money collector for the Organization. Bruner asked Chris, "Do you have five-forty you can give him right now?" Chris said he would check to see if he did, and Bruner said, "If you don't, just go over to my safe. I wanna pay him so don't let him leave unless you pay him." Chris later said that he had the money. This call shows that Bruner's leaving money in the freezer is one of the ways he ordinarily transfers money.  It also shows that Bruner maintains a safe in his home for the cash not being transferred by placement in the freezer.

[Instrumentality Protocol]

54.     Other calls show that Bruner routinely leaves money or receives money via the freezer.  In another call on July 23, 2015 (Call 14072), Bruner spoke with an unidentified male who appeared to be a gambler, and agreed to leave money for him in the freezer.  Specifically, Bruner said, "I'll put it in the freezer in the backyard, . . . . It'll be in an envelope.  You'll see your name on it."  Later on in that conversation, it became apparent that the unidentified male was a gambler.  Bruner asked him, "The only thing I'll need you to tell me is how much you want?  Give you all of it, some of it, most of it, what do you want?"  The caller responded, saying, "well I don't want to get us too confused.  But I'll tell you what probably to do, is just ehh, take out 500 of it.  So give me whatever of that.  Uhh, So 500 and, so your probably gonna give me 500 and i'll leave 500, how about that . . . I've already lost a bunch of money and I'm figuring I'm gonna lose 500 this week.  That's what I'm kinda figuring. . ."  As the caller is talking about losing this week strongly suggests that he is a regular bettor with the Organization, and that Bruner is settling up with that bettor by transferring some money via the freezer.

55.     The tenor of these conversations shows that Bruner regularly exchanged money by placing it, or having others place it in the freezer.  It can also be easily inferred that he has a safe in his home for holding the cash either received in the freezer, or distributed via the freezer.  As explained above in paragraphs 49 and 50, other records must exist showing how much is owed to whom and for what.  Hence I believe that there will be records, documents, and cash proceeds of the Organization located at SUBJECT PREMISES 2.

E.      SUBJECT PREMISES 3

56.     The investigation has revealed that Chang resides at SUBJECT PREMISES 3. On numerous occasions, law enforcement has conducted surveillance of Chang at SUBJECT

28

[Instrumentality Protocol]

PREMISES 3. Specifically, the LAPD has observed Chang opening the mail box with a key, and has observed him inside the residence. A utility check conducted at SUBJECT PREMISES 3 shows a utility account in the name of Fred Chang, the brother to Chang. In addition, a vehicle registered to Chang has been observed parked in the gated garage assigned to SUBJECT PREMISES 3. In addition, intercepted communications, such as the one referenced above in paragraph 52, have established that Chang acts as a money collector for the Organization. Chang also attended the Las Vegas meeting in June 2015.

57.    On September 28, 2015 (Call 19477), Chang had a telephone conversation with Bruner wherein Chang agreed to pick up money from Bruner for Cyrus. Specifically, Chang asked:

| | |
|---|---|
| Chang: | Can I swing by or you want me to swing by later. |
| Bruner: | Um, yeah, I guess I mean no problem. |
| Chang: | Ok. I'm gonna head your way. Thanks, bye. |
| Bruner: | You know we don't have anything I don't have much, I have like. . . What did they give you today, forty three? |
| Chang: | Yeah, uh, Cyrus said you had ten seven or ten for him |
| Bruner: | Yeah, yeah. Ok, all right. I'll meet you. When are you going to be there? |
| Chang: | I'll be there . . . I'm gonna leave Long Beach now so I should be there by at least nine fifty. |

58.    Moreover, on October 14, 2015, law enforcement officers conducted surveillance of Chang. The officers observed Change leave the garage at SUBJECT PREMISES 3 driving a white Kia. Approximately twenty-five minutes later, law enforcement observed the Kia stop in the rear alley of 2979 West 235th Street, Torrance. An unidentified male person walked over to the driver's side of the Kia and handed Chang an object that appeared to be an envelope. Afterwards, Chang returned to SUBJECT PREMISES 3.

29                          [Instrumentality Protocol]

59.    In addition, SMS messages acquired during this investigation provide context for the surveillance. On October 13, 2015, Cyrus sent a text mail message to a bettor stating "Hey bro, u owe 3,037. Can u please settle up on that this week?" Several hours later, that bettor responded "Yes, can Dave run up on Thursday? I'm in meetings all day tomorrow and heading out of town on Friday." Cyrus replied that "Yes, Thursday is fine." Two days later, on October 15, 2015, the bettor advised, via text message that "I met with Dave. It was a rough month any free plays would be great."

60.    In another SMS message exchange, also on October 13, 2015, Cyrus asked the bettor to pay, saying "Hey bro, figure this week is 18,022. Please get w Dave." The bettor responded merely "K," then about half hour later, "Thursday afternoon." Cyrus said, "Sounds good."

61.    These messages demonstrate that [Dave] Chang is regularly engaged in the business of picking up money for the Organization. As such, they provide context for surveillance; we believe that money was in the envelope observed during the surveillance, and that when [Dave] Chang returned home, he took the money with him pending delivery to Cyrus.

62.    Based on information learned in this investigation, I believe that Chang picks up money for the Organization, and that he returned it to SUBJECT PREMISES 3. I believe further that Chang may keep proceeds of the Organization's activities at SUBJECT PREMISES 3, at least until it is delivered to Cyrus or to whomever else it may be directed.

63.    Moreover, surveillance has not revealed a regular place of employment for Chang to which he would go from day to day. He does not appear to have a place to keep and access the gambling money he collects except at his home.  I therefore believe that Chang

30

[Instrumentality Protocol]

maintains money he collects and/or distributes on behalf of the Organization at SUBJECT PREMISES 3.

F.     SUBJECT PREMISES 4

64.     I have confirmed that Cyrus maintains SUBJECT PREMISES 4 to store proceeds of his illegal gambling business. Cyrus's use of SUBJECT PREMISES 4 to store illegal gambling proceeds is consistent with the nature of the business where those safe deposit boxes are located. I know from their website, from another law enforcement agent's dealings with them, and from their responses to administrative subpoenas, that U.S. Private Vaults does not require renters to produce any form of identification to use a safe deposit box. Rather, rent on the box is paid in cash and access to the facility is via retina scan – the only personally identifiable information kept on file by the business. Once a renter gains access to the facility via retina scan he/she then accesses his/her safe deposit box by using a key specific to the rented box

65.     On February 12, 2015, Special Agents of the FBI observed Cyrus inside of U.S. Private Vaults. Based on this observation, an administrative subpoena was served on U.S. Private Vaults requesting the following: "Review of all surveillance footage from February 12, 2015, from 3:58 p.m. to 4:08 p.m. Pacific Daylight time, and production of all account information, including but not limited to rental agreements, storage box numbers, payment and rental history, and any and all other account information, for the customer identified in the surveillance footage as Cyrus Irani." This window of time needed to be expanded to 3:55 p.m. to 4:11 p.m. It was determined from U.S. Private Vaults' records that an individual scanned his eye on February 12, 2015 at 3:57:51 p.m. The box number currently associated with this retina scan is SUBJECT PREMISES 4. Administrative

31                          [Instrumentality Protocol]

subpoenas to U.S. Private Vaults have confirmed that on December 27, 2012, Cyrus originally rented a box that measured 5 x 10 x 22. One year later, on December 13, 2013, Cyrus increased the size of the box he rented to 10 x 10 x 22 inches. It is my belief that Cyrus moved to a larger box in order to store a larger amount of illegal proceeds. SUBJECT PREMISES 4 is paid in full through at least February 2016.

66.      Agents issued additional administrative subpoenas to U.S. Private Vaults and have confirmed that Cyrus accessed SUBJECT PREMISES 4 on the following dates: December 27, 2012, January 23, 2013, February 27, 2013, May 5, 2013, June 20, 2013, December 19, 2013, January 16, 2014, February 12, 2015, July 16, 2015, twice on August 14, 2015, and October 1, 2015.

67.      The most recent accesses were the two in August 14, 2015 and the one on October 1, 2015. August 14, 2015 was one day after the start of the National Football League preseason play. On October 1, 2015, there was a call (Call 6912) where Cyrus told an individual named "Connor" that Cyrus was in Beverly Hills, he has his money, and they discussed where to meet. This call was intercepted by an officer of the NYPD.

68.      Subpoenaed bank records for Cyrus's Bank of America accounts revealed that on January 16, 2013 – one week before Cyrus entered SUBJECT PREMISES 4 – Cyrus made a $98,100 cash withdrawal. Further, on February 6, 2013 – three weeks before Cyrus entered SUBJECT PREMISES 4, he made another cash withdrawal in the amount of $83,913.00. It is my belief that these cash withdrawals were made for the purpose of secreting cash in SUBJECT PREMISES 4.

69.      During the course of this investigation, five search warrants were executed on Cyrus's Internet website www.365action.com, one of his sports-wagering websites. Analysis

32                          [Instrumentality Protocol]

of Cyrus's annual wagering activity revealed a pattern of activity consistent with the schedules of professional and college sports such as football, basketball, baseball, and hockey.

70.    A review of the entry times for Cyrus's box reveals that they coordinate with NFL football season – December, January, and February – and also coordinate with Cyrus's lengthy travel plan to Armenia – July 16, 2015.  Typically, during the (Major League Baseball) "MLB" season, wagers will spike during the American and National League Division Series and then culminate in the World Series in late October.  Similarly, there is an ascertainable increase in wagering during college basketball's "March Madness" in March, the (National Basketball Association) "NBA" finals in early January, and the (National Hockey League) "NHL's" Stanley Cup playoffs and finals in June.  And while these seasons are profitable for the average bookmaker, no season in its entirety is more lucrative than the (National Football League) NFL's season.  It follows, therefore, that the heaviest volume of wagers are placed during the NFL's Conference Championship Series and, ultimately, the Super Bowl in late January. A review of Cyrus's master agent account detailing all the wagering volume on any particular sport demonstrated a substantial increase in volume during the 2014-2015 NFL football season.

71.    In my opinion, based on my knowledge of this investigation, this increase in volume is significant because it coincides with the dates of Cyrus's SUBJECT PREMISES 4 access.  For example, Cyrus accessed SUBJECT PREMISES 4 in December, 2012, and, in 2013, in both January and February.  Additionally, Cyrus accessed SUBJECT PREMISES 4 in December, 2013 and again in both January and February of 2015, all peak-season wagering months.

[Instrumentality Protocol]

72.     Surveillance has established that SUBJECT PREMISES 4 is approximately 45 minutes from Cyrus's home.  Because he has a safe in his home for the working capital of the Organization, it is my belief that Cyrus uses the safe deposit box to store money that is not immediately needed, and to secure his money when he is out of the country or away from home for an extended period of time, based on the evidence of the occasions when Cyrus has accessed the safe deposit box.  In July 2015, Cyrus left the country and traveled to Armenia.

73.     Additionally, in researching the FBI files, I have located an FBI-302 dated November 4, 2013 outlining an interview with an Emed Sidaros.  Sidaros stated that Cyrus is a very large bookmaker with over 500 customers.  Further, Sidaros said that Cyrus used off-shore Internet gambling websites to manage his illegal business.  Sidaros further stated that in 2011 or 2012, Cyrus brought him to a safe deposit box storage facility for which Cyrus had to put his eye to a retina scanning device in order for the door to open for him.  Sidaros stated that Cyrus accessed his medium to large-sized box, which was full of cash, and retrieved $120,000 and handed it to him.  Sidaros stated that while Cyrus removed the sum of cash, it "didn't make a dent" in the cash left in the box.  Based on Sidaros's description, I believe Cyrus took him to SUBJECT PREMISES 4.

74.     Hence, I believe that Cyrus has maintained this safe deposit box for several years for storing proceeds of his illegal gambling enterprise.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

75.     Based upon my experience and training, as well as my consultation with other law enforcement officials, I understand that bookmakers maintain within their residences and on their persons and vehicles bookmaking records; wagering paraphernalia consisting of sports information papers and line sheets; books of accounts; financial records (including but

34                          [Instrumentality Protocol]

not limited to, bank statements, cancelled checks, ledgers, receipts, tax returns, real property documents, wire and other fund transfer records); monetary instruments; safe deposit documents and keys; safes, telephone books and address books; telephones and wireless telephones; checks; money orders; cash; casino chips; financial records; notes; documents related to gambling (including but not limited to, betting slips, tally sheets or controller sheets, ledgers or logs, and account books); settlement figures; summary sheets; betting slips; code names of clients; names and/or aliases of businesses used to conceal their illegal gambling business; and computers, USB drives, hard drives, flash memory, compact discs, and floppy discs utilized for Internet gambling sites and wagering records. Bookmakers additionally utilize their vehicles, either owned or leased, to transport cash debts and settlement records, and as transportation to go to and from meetings with bettors to settle on their illegal gambling business.

76.     This application seeks permission to search for and seize the items described in Attachment B in whatever form they may be found. These items might be found in electronic form stored on a computer's hard drive or other digital devices. Some of these electronic records might take the form of files, documents, or other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

77.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers,

scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

36                              [Instrumentality Protocol]

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with

37                                      [Instrumentality Protocol]

more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime,

38                              [Instrumentality Protocol]

indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  78.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. **ITEMS TO BE SEIZED**

  79.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, attached hereto and incorporated herein by reference, which constitute evidence of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955; interstate and foreign travel or transportation in aid of racketeering enterprise, in violation of 18 U.S.C. § 1952; transmission of wagering information, in violation of 18 U.S.C. § 1084; money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and conspiracy in violation of 18 U.S.C. § 371, will be found at the SUBJECT PREMISES.

[Instrumentality Protocol]

## VIII.  CONCLUSION

80.     I have been informed by NYPD Detective Sean MacDonald that on

October 15, 2015, a New York state grand jury returned an indictment against Cyrus Irani,

Clark William Bruner, Richard Vanderwyk, and David Chang, among others. The indictment

charges 17 defendants with various illegal gambling crimes.  Specifically, the indictment

alleges that various defendants committed Enterprise Corruption, in violation of Penal Law

section 460.20(1); Money Laundering in the first degree, in violation of Penal Law Section

470.20(1)(b)(i)(A); Money Laundering in the second degree, in violation of Penal Law

Sections 470.15(3)(b)(i)(B)(ii) and 470.15(3)(b)(i)(A)(ii); Money Laundering in the fourth

degree, in violation of Penal Law Section 470.05(s)(a)(ii)(A)(b); Promoting Gambling in the

First Degree, in violation of Penal Law Section 225.10(1); and Conspiracy in the fifth

degree, in violation of Penal Law Section 105.05(1). The subject of the indictment included

criminal activity that I have already set forth in this affidavit as evidence of the ongoing

participation in an illegal gambling organization by the residents of the three subject

locations that I seek to search.

81.     For all the reasons described above, there is probable cause to believe that

evidence of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955;

interstate and foreign travel or transportation in aid of racketeering enterprise, in violation of

18 U.S.C. § 1952; transmission of wagering information, in violation of 18 U.S.C. § 1084;

//

//

//

40                      [Instrumentality Protocol]

money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and conspiracy, in violation

of 18 U.S.C. § 371, as described in Attachment B of this affidavit, will be found in a search

of the SUBJECT PREMISES, as described above and in Attachments A1 through A4 of this

affidavit.

JOHN BURNS, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this __26__ day of October, 2015.

HONORABLE ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE

41                                    [Instrumentality Protocol]